IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRENDA MATHIS ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civ. No. 15-345-SLR |
| ) | |
| OFFICER MICHAEL FOSSETT ) | |
| OFFICER SAMUEL SMITH ) | |
| OFFICER JOSE VASQUEZ, and ) | |
| OFFICER D. JONES ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM**

At Wilmington this 27th day of March, 2017, having reviewed defendants' motion for summary judgment and the papers submitted in connection therewith, the court issues its decision based on the following reasoning:

1. **Procedural background.** Plaintiff Brenda Mathis ("plaintiff") filed a complaint against the above named defendants related to her arrest in the City of Wilmington on January 27, 2014. Plaintiff alleges: (1) violation of 42 U.S.C. § 1983 use of excessive force, as to defendants Wilmington Police Officers Michael Fossett ("Fossett") and Samuel Smith ("Smith") (count 1); (2) violation of 42 U.S.C. § 1983 based on Fourth Amendment unlawful detention and arrest, as to defendants Fossett and Smith (count 2); (3) violation of 42 U.S.C. § 1983 based on First Amendment retaliation, as to defendants Fossett, Smith, and Wilmington Police Officer Jose Vasquez ("Vasquez") (count 3); (4) violation of 42 U.S.C. § 1983 based on malicious prosecution against all

of the named defendants (Fossett, Smith, Vasquez, and Wilmington Police Officer D. "Jones") (count 4); (5) intentional infliction of emotional distress, as to defendants Fossett (count 5) and Smith (count 6); (6) violation of 42 U.S.C. § 1983 based on Fourth Amendment unlawful seizure and retention of plaintiff's BMW, as to defendant Fossett (count 7); and (7) trespass to chattels, as to defendants Fossett and Jones. (D.I. 1, ex. A) Through the course of discovery and the instant summary judgment motion practice, plaintiff has withdrawn counts 6, 7 and 8.[1] The court has jurisdiction pursuant to 28 U.S.C. § 1331.

2. **Factual Background.** On the morning of January 27, 2014, Fossett and Vasquez stopped a BMW sedan ("the BMW") after they saw the vehicle pass through a stop sign. (D.I. 37 at A-3) Plaintiff's son, Steven Wright ("Wright"), was driving the BMW (which was owned by plaintiff), and Jeremy Watkins ("Watkins") was in the passenger seat. (Id.) Wright pulled the BMW over in the parking lot of plaintiff's business, LJ's Playpen Academy. (Id. at A-135) Vasquez approached the driver's side window of the BMW, and Fossett approached the passenger side. (Id. at A-3, A-9-10, A-135-36) Vasquez asked Wright for his license, registration and insurance card; Wright refused to comply with the request until he was told why he was pulled over; Vasquez responded that the stop would be explained once Wright complied with the request. (Id. at A100, A107, A109) Because neither Wright nor Watkins rolled down the

---

[1] Consequently, counts 6, 7, and 8 are dismissed with prejudice. Because there are no longer any allegations pending against defendant Jones, he is dismissed as a party with prejudice. Finally, plaintiff did not identify any bad conduct related to defendant Vasquez in either her deposition or her brief; therefore, defendant Vasquez is dismissed as a party with prejudice.

passenger door window, Fossett "could not gather information from or have an unobstructed view of the passenger compartment of the vehicle and the passenger." (*Id.* at A-3; A-108-109) "Due to the lack of cooperation, Fossett called for an assisting unit." (*Id.* at A-3)

3. It was about at this time that plaintiff approached the BMW, by her own admission coming within 15 to 20 feet of the car. (D.I. 1, ex. A at 4; D.I. 37 at A136, A142, A211) Defendants assert that they warned her to not interfere with the traffic stop,[2] and that plaintiff and a second female[3] "were advised to go across the street numerous times with negative results." (*Id.* at A4) Shortly after the incident and in her complaint, plaintiff also asserted that she was told by police officers to "[g]et the ____ away from the car." (D.I. 1, ex. A at 4; D.I. 37 at A211) By the time of her deposition, she was asked if she recalled either Fossett or Vasquez[4] "telling [her] to leave the immediate area of the stop." Her reply was "No."[5] (*Id.* at A144) Although plaintiff concedes that she conversed with her son, she denies telling him to disregard the

---

[2]According to the deposition testimony of Fossett, he asked plaintiff to "just go across the street . . . stop interacting," because plaintiff was communicating directly with her son and "yelling to him, 'Don't give them your license or anything until they tell you why you're pulled over.'" (*Id.* at A10; *see also id.* at A3)

[3]Plaintiff was accompanied by a second female, identified by plaintiff as a parent of one of her children, Jaleesa Banner. (*Id.* at A142) According to the record, it was one of plaintiff's employees, Diane Mallard, who eventually became involved in the incident at issue, giving an interview and taking a video recording. (*Id.* at A111, D.I. 39)

[4]Identified by plaintiff as "Officer Lopez." (*Id.* at A144)

[5]Plaintiff could only recall Vasquez speaking to her once, to say that he could give her the food her son had brought. (*Id.* at A144)

3

police officers' instructions or using loud or offensive language. (*Id.* at A135-36, A143-44)

4. When the assisting officers arrived on the scene, Fossett ordered Smith to place plaintiff under arrest due to her continued interference with the traffic investigation. (*Id.* at A3-4, A12-13, A34-35, A37) The parties have different accounts of the attempts by Smith and Fossett to effectuate the arrest, with defendants recounting plaintiff's efforts to physically resist arrest[6] and plaintiff describing the force used to effectuate the arrest.[7] At a minimum, however, it is undisputed that plaintiff remained at the traffic stop, did not refrain from participating in some manner with the police activity, and cannot be characterized as cooperating with police efforts to carry out their duties.[8] After plaintiff was taken into custody, she was transported to the emergency room by police officers due to her complaints of chest pain and wrist pain. It is not easy to decipher the related medical records (*id.* at A79-94), but it appears that plaintiff was discharged "with a negative work up,"[9] then came back later that day "upset that she was not given [a] proper work up" in the first instance. Plaintiff presented the second time with complaints of right wrist pain and body-wide pain related to her earlier

---

[6]*Id.* at A4, A14, A42-43.

[7]*Id.* at A147-149.

[8]Facts confirmed by the video footage of the incident contained in the record. (D.I. 39, physically submitted in D.I. 37 at A33 and A60)

[9]During her first hospital visit, she was under arrest and accompanied by defendants Fossett and Vasquez. According to plaintiff, Fossett did not allow her to use the restroom, causing her to have an accident. (*Id.* at A160) Plaintiff also has alleged that Fossett left her alone in a room with a man who was "psychotic," although the duration of this incident appears to be momentary. (*Id.* at A161-162)

4

interaction with police.[10] (*Id.* at A68) The discharge diagnosis was contusion of the left wrist[11] and rib pain. (*Id.* at A61, A68) Plaintiff ultimately was charged with disorderly conduct and resisting arrest and was released from custody.[12] Plaintiff contends in this litigation that she continues to suffer from physical pain and weakness and emotional trauma.

5. **Standard of Review.** "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n. 10 (1986). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions,

---

[10]Plaintiff went to the hospital the first time because she complained of chest pain. She did not present the second time with chest pain and, in fact, has stopped taking her heart and blood pressure medication because she is "upset with Fossett." (*Id.* at A68, A171) Plaintiff has submitted no personal medical records from any health care professional.

[11]Although exhibit A attached to plaintiff's brief appears to be an undated photograph of her bruised right arm. (D.I. 42, ex. A)

[12]It is the court's understanding that all charges against plaintiff were subsequently dismissed because the police officers failed to appear at her trial. Plaintiff filed a Citizen's Complaint with the Wilmington Police Department Office of Professional Standards, alleging that Officers Fossett, Smith, and Jones used excessive force, rude and insulting language, and improperly handled plaintiff during her arrest, which complaint was found to be unsubstantiated. (D.I. 37 at A-95-129)

interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 415 U.S. at 587 (internal quotation marks omitted). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

6. To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Although the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," a factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

7. **Qualified immunity defense**. With respect to counts 1, 2, and 4, defendants assert that they are protected from suit by the qualified immunity doctrine. (D.I. 36 at 8) Under certain circumstances, government officials are protected from § 1983 suits by qualified immunity. The doctrine of qualified immunity serves to protect officers from civil liability "when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). Accordingly, it gives "ample room for mistaken judgments," *Hunter v. Bryant*, 502 U.S. 224, 229 (1991), whether the official's mistake is a mistake of fact, mistake of law, or mistake based on mixed questions of fact and law, *Pearson,* 555 U.S. at 231. In the context of Fourth Amendment claims, qualified immunity operates to "protect officers from the sometimes 'hazy border between excessive and acceptable force,' and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz,* 533 U.S. 194, 206 (2001) (quoting *Priester v. Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) (internal citation omitted)).

8. The court makes two inquiries when analyzing qualified immunity. Under the constitutional inquiry, the court examines "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Pearson,* 555 U.S. at 232 (quoting *Saucier v. Katz,* 533 U.S. 194, 201 (2001)) (citation omitted). Second, the court inquires "whether the right at issue was 'clearly established' at the time of a defendant's alleged misconduct." *Pearson,* 555 U.S. at 232. Courts have the discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Id.* at 236.

9. **Unlawful arrest and detainment (count 2), and malicious prosecution (count 4).** Plaintiff was arrested for disorderly conduct and resisting arrest. (D.I. 1, ex. A at 6) Plaintiff alleges that defendants Fossett and Smith did not have probable cause, nor did they have a reasonable suspicion, to seize her. (*Id.* at 8) Defendants argue that there are sufficient facts to demonstrate that Fossett and Smith had probable cause to effectuate plaintiff's arrest under 11 Del. C. § 1301(2), that is, for "engag[ing] with at least 1 other person in a course of disorderly conduct as defined in paragraph (1) of this section." Paragraph 1 describes a whole gamut of possible conduct, but defendants in their brief highlight plaintiff's "continued refusal to obey Officer Fossett's order to disperse," a violation of 11 Del. C. § 1301(1)(e) ("Congregating with other persons in a public place and refusing to comply with a lawful order of the police to disperse."). (D.I. 36 at 15-16) As to the first prong of the qualified immunity analysis, the court concludes that a Fourth Amendment violation could not be made out even with a favorable view of plaintiff's submissions. As noted above, there is no dispute that Fossett ordered plaintiff to get away from the BMW. A review of the video footage also demonstrates that individuals other than plaintiff started congregating in the vicinity of the BMW, and that these bystanders were interacting with both plaintiff and the police. The record contains sufficient undisputed facts to support a probable cause determination as to plaintiff's arrest for disorderly conduct.[13] Therefore, defendants had

---

[13] Even if the court were required to address the second prong of the qualified immunity analysis, it is evident that in the specific context of this case - an ordinary traffic stop with third party participants like plaintiff - it would not be clear to a reasonable officer that arresting plaintiff for disorderly conduct would violate her Fourth Amendment rights.

8

probable cause to initiate a prosecution against plaintiff. Defendants' motion for qualified immunity is granted with respect to counts 2 and 4.

10. **Excessive force (count 1).** The parties agree that *Graham v. Connor*, 490 U.S. 386 (1989), "clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Saucier*, 533 U.S. at 201-202; *Pearson*, 555 U.S. at 232. Taking the facts in the light most favorable to plaintiff, the court concludes that a Fourth Amendment violation "could be made out." *Saucier,* 533 U.S. at 201. The next step, therefore, is to determine, "in light of the specific context of the case," whether plaintiff's Fourth Amendment rights were clearly established. *Id.* The Supreme Court in *Saucier* has explained this inquiry in terms of whether the record contains "substantial grounds for the officer to have concluded he had legitimate justification under the law for acting as he did." *Id.* at 208. The Court also recognized in its analysis that under *Graham*, "the right [attendant to an arrest] to use some degree of physical coercion or threat thereof" must be balanced with the circumstances of the arrest, keeping in mind the fact "that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. Consequently, "[u]nder qualified immunity, police officers are entitled to a certain amount of deference for decisions they make in the field." *Giles v. Davis*, 427 F.3d 197 (3d Cir. 2005) (citing *Saucier*, 533 U.S. at 204-205). Moreover, it is sometimes difficult, e.g., "for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the

officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Saucier,* 533 U.S. at 205. To put the point differently, "[q]ualified immunity encompasses mistaken judgments that are not plainly incompetent." *Giles,* 427 F.3d at 207 (citing *Hunter v. Bryant,* 502 U.S. at 229).

11. As the court understands the Supreme Court's jurisprudence on qualified immunity, the first prong of the analysis views the facts in the light most favorable to the party asserting the injury, consistent with *Saucier,* 533 U.S. at 201. The second prong, however, is not so limited but, instead, requires the court to objectively review the facts of each case to determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," *id.* at 202, or whether the officer's "actions fell in the 'hazy border between excessive force and acceptable force.'" *Brosseau v. Haugen,* 543 U.S. 194, 201 (2004) (citing *Saucier,* 533 U.S. at 206)). The inquiry is highly individualized and fact specific, with the Supreme Court identifying three factors for consideration: (1) the severity of the crime at issue; (2) whether the suspect posed an imminent threat to the safety of the police or others in the vicinity; and (3) whether the suspect attempted to resist arrest or flee the scene. *Santini v. Fuentes,* 795 F.3d 410, 417 (3d Cir. 2015) (citing *Graham,* 490 U.S. at 396); *see also Sharrar v. Felsing,* 128 F.3d 810, 822 (3d Cir. 1997) (providing additional factors including "the possibility that the persons subject to the police action are themselves

violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time"). It is with this precedent in mind that the court reviews the record in terms of plaintiff's excessive force claim.

12. As noted above, plaintiff admits that she interacted with the police officers during the traffic stop, a fact confirmed by the video footage.[14] Having inserted herself into the traffic stop, the video footage demonstrates that the stop attracted bystanders. (Id. at A13, A-44, A152-53) The video footage reflects that, while trying to apply handcuffs, Smith placed his hands on plaintiff's jaw line and ear area, "like a pressure point hold." (Id. at A149) Although plaintiff maintains that Smith and Fossett kicked her (leaving bruises), and grabbed her neck, throat, and face, effectively chocking her, the court is unable to locate any footage demonstrating that plaintiff was at any time chocked or kicked by Smith or Fossett. The video depicts plaintiff speaking while Smith has his hands on her jaw and ear area, as handcuffs are applied and as she is removed from the scheme. It is apparent from the video that plaintiff was both very emotional and uncooperative and that the force used was reasonable.[15] Finally, consistent with

---

[14]The video was apparently taken by a person at the scene and depicts a frenetic, fluid series of events beginning with plaintiff facing and against a parked van with two then three officers around her attempting to apply handcuffs. Smith appears to have his hand under plaintiff's jaw line and then between the area of her ear and jaw line.

[15]Plaintiff's version of the facts differs from that of Smith in the following respects. Plaintiff was holding a cup of hot tea during the incident: she alleges that it spilled when Smith grabbed her wrist for handcuffing; Smith asserts that he advised her to put the cup down and it spilled when a bystander took the cup from her. Smith asserts that,

the only medical records submitted, the injuries she sustained as a result of the arrest were neither significant nor permanent.[16] This evidence suggests that, at minimum, defendants' conduct fell in the "hazy border between excessive and acceptable force." *Saucier*, 533 U.S. at 206. Therefore, plaintiff's Fourth Amendment right to be free from excessive force was not clearly established under the particularized facts of this case. Defendants' motion for summary judgment is granted in this regard.

13. **First Amendment retaliation (count 3).** Defendants argue in support of their summary judgment motion that First Amendment retaliation claims apply only in employer-employee contexts. (D.I. 36 at 18) Although this contention is not legally correct, plaintiff has only cited a single case that is outside the scope of the employment relationship. In *Estate of Smith v. Marasco*, 318 F.3d 497 (2003), the Third Circuit explained that a plaintiff must prove the following three elements in a First Amendment retaliation claim: (1) that plaintiff engaged in protected activity; (2) that the

---

after receiving the order to arrest plaintiff, he placed her right wrist in handcuffs and she began to flail and scream. Although plaintiff concedes that she was yelling that Smith was hurting her arm, plaintiff denies that she resisted the arrest. There is no dispute that plaintiff was pushed against a van, according to Smith to help control her. Plaintiff asserts that Smith and Fossett kicked her (leaving bruises), and grabbed her neck, throat, and face, effectively choking her ("like a pressure point hold," *id.* at A149) and leaving scars. Smith admits that he attempted on several occasions to use pressure points (first underneath her jaw line and second between her ear and jaw line) to get her to comply, and that plaintiff's face was up close to the van during this time. Plaintiff asserts that force was used to get her into the van; Smith asserts that, once plaintiff was handcuffed, she was peacefully escorted to the patrol car. (*Id.* at A42-46; A146-151)

[16]The court recognizes that plaintiff describes her injuries otherwise. At this stage of the proceedings, however, when plaintiff has been represented by counsel, discovery is closed, and she certainly had access to her personal medical records, the court declines to simply accept her version of the facts when there is opposing objective evidence.

government responded with retaliation; and (3) that the protected activity was the cause of the retaliation. *Id.* at 512. Like cases decided in the employment context, however, plaintiff's decedent in *Smith* had engaged in prior protected activity, that is, he had written complaints against the state police officers now accused of retaliatory conduct. *Id.* at 502. In this case, all of the conduct - the alleged protected activity and the alleged retaliation - are occurring contemporaneously in the context of police activity. The court declines to find that the record supports the elements of a First Amendment retaliation claim and, therefore, grants defendants' motion for summary judgment in this regard. *See generally Startzell v. City of Philadelphia, Pa.*, 533 F.3d 183, 204 (3d Cir. 2008) (although an individual's speech may be protected by the First Amendment, her "choice to disobey police orders is not").

14. **Intentional infliction of emotional distress ("IIED") (count 5).** Plaintiff alleges that Fossett intended to physically and mentally harm her. (D.I. 1, ex. A at 10) IIED is a state tort claim, and Fossett argues that he is immune from liability under the Municipal Tort Claims Act ("the Act"), 10 Del. C. §§ 4010-13. (D.I. 36 at 18) The Act provides that "all government entities and their employees shall be immune from suit on any and all tort claims seeking recovery of damages." 10 Del. C. § 4011(a). The Act does not protect employees from conduct that was "performed with wanton negligence or wilful and malicious intent." 10 Del. C. § 4011(b). Assuming for purposes of this motion practice that Fossett's conduct falls within the scope of § 4011(b) exception to immunity, there still must be sufficient evidence of record as to plaintiff's IIED claim to withstand summary judgment. According to the Delaware Supreme Court, it is the

13

court's duty to determine whether Fossett "intentionally engaged in extreme or outrageous conduct that caused severe emotional distress." *Hunt ex rel. DeSombre v. State, Dep't of Safety & Homeland Sec., Div. of Delaware State Police*, 69 A.3d 360, 368 (Del. 2013). Plaintiff alleges that Fossett cursed at her, accused her of faking her injuries, forced her to urinate in her clothes, and placed her alone in a room with a psychotic man. (*Id.* at A159-160) Plaintiff further testified that she began seeing a therapist after the incident. (*Id.* at A171) As noted, plaintiff has submitted no personal medical records from any health care professional; consequently, there is no objective evidence of any continuing emotional distress. Nor is there any objective evidence that her being left alone with a "psychotic" man was anything but momentary. (*Id.* at 161-162) The court declines to find that plaintiff's remaining allegations constitute actions so extreme and outrageous as to fall within the scope of 10 Del. C. § 4011(b). Defendants' motion for summary judgment is granted as to count 5.

15. **Conclusion.** For the reasons stated, defendants' motion for summary judgment is granted as to counts 1, 2, 3, 4, and 5. An order shall issue.

_____
Senior United States District Judge